Good morning, Your Honor, Your Honors. My name is Rockney Cole and I represent the appellant Jeremias Sanchez-Velasco. Normally in an oral argument you don't like to begin your argument with a mistake, but I do want to identify an error that I made in the brief and it relates to the standard of review. I indicated that it was a clearly erroneous standard in terms of determining whether there was custody or not. That is not the law. It's United States v. Axum, 289F, 3rd Series, 496. The determination of custody is de novo for this Court and so this Court will be conducting a de novo review of the underlying issue of custody. Of course the facts remain under the clearly erroneous standard. The bulk of my time I would like to focus on relates to the Court's application of Factors 2 and Factors 5 of Griffin. In the officers in this case interviewed the defendant in the conference room, the door was closed. Below, the Court and the government placed substantial weight on United States v. Black Bear as well as United States v. Lebron, indicating that well in those cases the door was closed too and that therefore if the door is closed that's not an adverse factor. But one of the things, if you look at those particular cases and the underlying facts, they were near models in terms of what an officer is supposed to do. In Black Bear, the officer informed, I believe it was at the hospital in an injury case, he expressly informed the suspect that he was not under arrest, that he did not have to speak with him, that he could end the interview at any time and I think as a factual matter in that case there was no arrest at the conclusion of that. What were the two incriminating questions? The incriminating questions was whether, well it was significant at least for us in terms of whether he was in the country illegally or not. This was, these were ICE people and they were interviewing someone detained because of probable grounds for removal. But under And the HCFRs, there's a very different standard for what can be questioned. If that's what the actual intent of what they're doing, but I don't think that's the record in this case, Your Honor. A finding on that? Well, in terms of the beginning of the case We know that the questioning at the ICE offices had nothing to do with the reason he was arrested. Well he was You know, the inferences that you're challenging are, this wasn't questioning based for the offense charged. This was immigration, alien removal questioning. Under the criminal alien program, and I believe it was Nussbaum that said that was one of his primary jobs as well as Mr. Walker. If you look at the record, Your Honor, Ms. Love had, once she realized there was not a match between Mr. Sanchez and the social security number that he had on his application, she immediately called Agent Nussbaum, the state of Iowa, who investigates essentially transportation related issues related to social security. They then immediately called the two ICE officers who then, I believe it was Nussbaum who told her to stall until they got there. So the purpose, Your Honor, was for purposes of investigating. No, his arrest was for being in the country illegally. It was not an 18 USC arrest. It was not an 18 USC arrest, too. It was an 8 USC administrative, if you will. But for purposes of using the, I think there's also still the issue in terms of using the information for purposes of a criminal case. Only if that's the intent in the questioning. But, well, I think that it was if you look at what... Well, wait. I mean, if there is an administratively valid interrogation, questioning, whatever you want to call it, of an alien suspected of being removable. And the alien discloses a violation of 18 USC somewhere. That's usable. That's not suppressible just because the alien in answering valid or lawful questions gave other incriminating information. If it was the sole purpose of the interview, but I think the... What you have here is, oh, well, yeah, that's partly what we do. Well, there's also the issue of, I think, the context. I think clearly they knew, and I think the records suggest that, that they, that there was essentially a suspect for using a social security number that didn't belong to him. Now, it is true that the indictment did not actually accuse him of violating or making any misstatements at the actual station. But this does come up in the context of a conditional guilty plea. We had made the motion to suppress, and we wanted to get the information out that he had admitted that he was in the country illegally. And also related to the Ochoa case, I believe that that case is very clear, that if you have reason to know, as a black letter law, if you're just doing biographical data, and that's all... Wait, the government prevailed in Ochoa, and the... It's not dicta, but the... It's not directly... It's got to be not directly relevant to the offense charged. If the questioning is not directly relevant to the offense charged, and at the time the questions were, the reason for the arrest, I mean, there wasn't even an offense charged, but the reason for custody was likely removal. Well, I believe they were conducting a criminal investigation at that point, rather. Would you believe that? Well... Wait a minute. Where is that in the suppression findings? Well, ultimately, if you look at what they argue in the inevitable discovery, what they say was, is the officers continued on with the investigation. They were able to determine, I believe, with the officer Nussbaum, that the social security number that he had presented on that day did not match, or was used in the context of the eye. But you had the burden of suppression hearing to prove that the questioning was illegal. The custody was legal. There was probable cause to arrest because he admitted he was not in the country legally. Now, it wasn't a criminal justice arrest, it was an immigration arrest or detention. Well, I mean, that really... If the questioning is consistent with the department's pursuit of the immigration issue, there's always criminal... Yeah, when the basis for the discovery of being here illegally is the use of a suspicious social security number to gain employment or do some of the other things that we see prosecuted. Sure, that's always in the background, but you have to prove that the questioner at the time of the questioning had that as the dominant purpose for the interrogation. And I don't see that that was done. Okay. Well, in terms of what the court actually addressed, I mean, that really did not come up significantly. It was mainly the question of whether they were in custody or not. I mean, that was... I thought it was mysterious that there was nothing in the briefs or not much in the district court to the magistrate judge's opinion about this aspect. Well, yeah, and there was no issue, and it was certainly not raised by the government in its brief either. So in terms of the other significant factor that was utilized, one was the fifth factor related to police domination, and that related to the Axum case. In the Axum case was a case where there were nine officers, and two of them had spoke to him in close quarters, and the court cited that favorably to make an adverse finding, indicating that that revealed that there was not police domination. But in the Axum case, it was a child pornography case, and in that particular case, he was at home. He was able to move around. Yes, there were more numerical officers, but I think in terms of the context of the relevance to this particular case, it was not police dominated in this case. In this particular case, you had two officers in a conference room in close quarters with no one else present. I know we have these factors, but if we just look at it from a question of common sense, I mean, basically these ICE officers, they were plainclothes, right, and they didn't have their guns or badges showing, and they say, hey, we have something to talk to you about. Would you like to join us in this conference room? And yes, they closed the door, but for privacy, and they have a cordial conversation. It seems to me, I'm hard pressed to say that somebody under those circumstances is in custody or everybody's in custody. Well, no, I mean, that's not true because, I mean, if you look at Blackburn and those sorts of cases, one of the factors that Griffin plays a significant way to us is that you are not under arrest. You are free to terminate this questioning. You don't have to talk to us. Why didn't they do that? Well, they didn't tell them that they didn't do the opposite, though. They didn't say you had to talk to us and you are under arrest, correct? That is correct. I'd say factor four is probably our weakest factor in terms of, but all the other ones, there was arrest at the end of the questioning. All the other factors are in favor of his position, especially when you look at factors two and five properly understood. With permission, I'd like to ask another question. With regard to the Miranda issue and the interrogation or biographical information obtained at the ICE facility, what information obtained during that questioning directly related to the offense charge? Because I think that's a close question here. Well, I mean, he was ultimately charged with use of a social security number on an I-9 and as well on a W-4 misuse and possession of a forged document. If you're talking about biographical information, date of birth, where you're from, country of origin, I think the government's going to use that information at that prosecution for misuse. I mean, it's certainly relevant for purposes of the jury to make that consideration. It's not irrelevant information. Is it different information than they obtained at the treasurer's office? The treasurer's is very limited. It was just related to the consular ID and the fact that he was in the country illegally. So we wanted to clean up that record based upon the unlawfully obtained information. Thank you, Your Honor. Thank you. Mr. Cole, we note you were appointed under the Criminal Justice Act and the court appreciates your assistance. Ms. Neidl. Good morning. My name is Emily Neidl. I'm an assistant United States attorney from the Northern District of Iowa. I'm here representing the United States of America. I would like to start this morning by making a correction to the government's brief. I noticed last night while preparing for today's argument that pages 18 and 19 in the discussion of the Griffin factors, our brief states that factors 2 through 5 were found to favor a finding the defendant was not in custody. My review of the district court's order denying the motion to suppress reflects that the third factor, whether or not the suspect initiated contact, the district court actually found that that factor slightly favored the defendant. That can be found at docket 32 at page 10. Even with that correction, weighing these factors in the totality of the circumstances, the district court... Why didn't you argue? Maybe you did and it just didn't make it into the opinions, but why did the Griffin factors even matter if this was valid immigration investigation and ultimately detention? Your Honor, I believe in our original response, we argued the issue with regard to at least interrogation... To the district court. To first the magistrate court, but then... So it was contained within that briefing. Then the magistrate made the recommendation and then ultimately the district court affirmed. It didn't address the issues. It didn't really address at all the discussion. Is that an alternative ground? I think it could be, yes. Ultimately... Why isn't it argued? If it was argued at the district court, why wouldn't that argue it does? We've had a lot of... I've had some serious cases about the extent to which immigration investigators are not... By HCFR regulations or agency practice are not limited to the confines of Miranda and Griffin and so forth. Certainly... All they're doing is pursuing removal. Certainly, Your Honors, could find based on that factor and based on our argument, any argument that's been previously argued could be a basis. But ultimately, what the district court found in this case was that regardless of whether or not there was an interrogation, Miranda wasn't necessary, regardless if there was an exception. Because I think, in effect, both the booking question issue and then the special immigration type questions and inquiries are, in essence, exceptions, if you will. Let's talk about that a little more. Given Callison's testimony, why was a Miranda warning not necessary before the interrogation at the ICE facility? Because it seems to fall outside the biographical information exception, given Callison's testimony. I believe, Your Honor, that specifically the district court found otherwise. Didn't Callison testify that he knew the information could be relevant to an investigation into the social security number charge? Your Honor, I believe specifically with regard to this, at page 13 and 14 of the district court's order, Judge Reed noted that at the ICE office, her findings were that this was routine booking procedure. But I'm asking about Callison's testimony. I think it was the opposite of that. I believe his testimony indicated that he did not seek information with regard to specifically the social security card or issues relating to work. But he knew it would be relevant. Well, Your Honor, I think at all times when you take biographical information, you know that that's relevant to any case. And that's not unique to immigration cases. I mean, to a certain degree, we focus more maybe on identity with regard to immigration cases. But in all cases, all of the biographical information could be useful to the prosecution of a case. I don't disagree. It's just that the criteria for the exception to the booking information rule requires, it seems to fall into that exception, if you know that it's relevant. But it's relevant to the charged offense. Right. And the charge, but it's got to be relevant at the time, doesn't it? I believe so, Your Honor. Because it turns out to be relevant to a criminal offense that had nothing to do with the question at the time it was asked, is that enough for the suppression? I don't believe it is, Your Honor. Or there would be several biographical type questions. I don't think Ochoa says that. I believe both Ochoa and then looking at Garcia Zavala, in both of those circumstances, we had situations where defendants were in similar type circumstances. And the types of questions that were asked by Officer Kallison fell into that same vein. Specifically, again, the district court finding that at page 14, the court finds that the questions Officer Kallison asked the defendant were properly part of the ICE administrative processing procedure. Well, let me ask you this, though. I heard Judge Grott say something slightly different, which is that he knew it would be relevant. So if at the time he knew it was relevant to a potential charge, that would be different, right? Maybe I'm mis-concerned. But that's what I heard him say. I don't have the testimony sitting in front of me. I believe that there's somewhat of a distinction, yes, being proposed by Judge Grott. I don't have my finger on, at this moment, Officer Kallison's testimony. I can attempt to find it. But ultimately, his testimony is what it is. But the district court, in reviewing that testimony, found that these questions were specifically not intended to get at the issues that were ultimately the issues that the defendant was charged with in this case. Well, and that brings up an interesting point. Even if that testimony says would be relevant, it's also, it gets a little bit to Judge Loken's point, which is it's also relevant to what they had him in the ICE facility for, which is whether he's here illegally. Because if he has a valid Social Security number, he's not here illegally, most likely. And if it's not a valid Social Security number, then he's probably here illegally, or at least there's a... So what do we do when we have... There's two potential purposes. One is what he's there for, which has nothing to do with the criminal charge. And one just happens to affect the criminal charge. I think the question then comes down to, to some degree, what's the goal? And for Officer Kallison, it was not to build a criminal prosecution. That may have occurred. Information could have been gained. But ultimately, what he was trying to do here was process this defendant. He needed to know information about his biographical information. He didn't know where he came from. He needed to know if he had children. He needed to know, did he have a spouse or not? He needed to know, why did he come to this country? He needed to know, why are you not returning? Is it because you're afraid? All of these had to do with what Officer Kallison was trying to process through. It's a little bit similar to what occurred when the deputy at the treasurer's office is trying to process the defendant's information, and she is not in the vein of thinking, hey, I'm trying to gather information to prosecute him. She's literally thinking, how do I get this guy's tag so I can get to the next person, so I can get the next person's plate? How do I continue to move through my day? And that was her goal in that issue. And yet that's not – I'm looking at transcript pages 60 to 61, where Kallison testified that he was aware that a potential federal offense had been discovered at the treasurer's office, based on the social security number being incorrect, and that the questions he asked could be used in connection with the possible criminal investigation. That's very different. Well, I think to page 60, he's asked at line 15, and there wasn't any indication at that point you knew federal charges had occurred. And then they go on, and he says, to be honest, it wasn't in my mind. He was thinking more about the processing. He goes on to explain he's talking about processing, and that's his goal at that moment. So, yes, there could be criminal charges, but ultimately that's not his goal, and he needed to get the biographical information for other purposes, and it wasn't questioning relating to the work situation, whether or not he had used documents in that capacity. I would note that when considering the Griffin factors, again, with the totality of the circumstances when looking at these, ultimately the defendant was not in custody at the time at the treasurer's office. Defense counsel focused on two points, the first being the understrained freedom of movement. It seems to argue that because they go into a private room, that he is, at that point, doesn't have a freedom of movement. I would note in this case that this was a circumstance where he was in a crowded, noisy room when approached by the officers. A room was obtained for the purposes of giving the defendant privacy. This was not a situation as described in many other cases where this was a room within the police department where it was a small, cramped room with no windows. It's not how it was described. So I would argue that this wasn't a factor that weighed, within each factor I would say that there's, as you weigh factors within factors to decide which way the factor goes, would argue that that in itself is not sufficient to make the other factors and considerations with regard to freedom of movement. Does it make any difference to what a reasonable person would understand the fact that he'd been told by the treasurer's staff that he couldn't go? Well, I think ultimately, Your Honor,  But she didn't tell him that, right? Well, the way she described it, and if I may continue, I see your point. But she didn't tell him that he couldn't go. I thought that there's some dispute about whether she said he could go. I think what she told him was you can go, but essentially, and again, if I may continue. Why don't you wait around so we can find out if your documentation is okay. I took her comments and statements to be. Is that what the testimony was? I believe so. She told him that you could go, but essentially, we're going to have to start all this over. Let's wait and see if we can get the document cleared up. That's not telling him he can't go. She didn't order him to stay. She didn't say you need to stay here. What she said was essentially you can go, but it will take more time. You're wasting my time by doing that, which is different than being ordered or directed or in some form of strong-arm tactic. The difference between a helpful clerk and a commander. Yes. But still, with that clarification, I'm not sure what the question is, I guess. Well, the question is, does that affect what a reasonable person would think given the prior conversation with the treasurer's office? I think a reasonable person in that situation is aware that maybe a social norm would say, hey, in order not to waste everyone's time, I would stay, but I don't think that's different than not believing that you can go. And so in this case, the indication was he was told that you can leave, and there's no indication that he thought he couldn't leave because of her statements. So I think a reasonable person would still be under the understanding that if they had the ability to leave, whether or not they chose to leave is a different question. So the fact that he acquiesced to her request to stay so that they could finish the process. And again, her testimony is clear. Her comments were made with the goal of let's get these tags, let's get this thing processed, not with the goal of – But she had been told by ICE to stall him. At that point, though, I think the testimony is clear that in her mind, she's still in attempt to process the situation. The reason for her reaching out to the investigator wasn't for the purpose of having him convicted or charged with any crime. The goal was you can help us clear this up. That's what you do. And your investigative abilities maybe can still let us know, okay, this is how we need to fix it, the paperwork's wrong, whatever needs to be corrected. I am out of time, so thank you. Very good. Thank you. Mr. Cole, do you have some time? I'll give you a minute or two for a moment. So just to address your issue about what she actually told him, that is found at transcript page 24, lines 18 through 25. She acknowledged in her report did not even address whether he was free to leave or not, and she also admitted that she told him it was not okay to leave until he gets there. And that's on line 24. The only other portion of the transcript that I would direct the courts Well, but on that, I think she originally told him he couldn't leave, and then she told him he could leave. Is that right? I think she first indicated he'd asked if he was free to leave, and she said no. And I think as they were waiting, it's my understanding that he then said, hey, I would like to go. And then she said it's not okay to leave until he gets there. So you're saying, according to the record, she never told him he could leave? No. I think during initial questioning, he said it was okay if I leave, and I think she had said that, yeah, it was. Okay. Got it. And then she followed up with that. The only other thing, Your Honor, is on page 50, 55, Mr. Callison said that his main job is to arrest criminals, and that's at transcript 55, lines 24 through 25. So that's his main purpose with a criminal is to arrest criminals. So that's all I have. My time is out. Thank you. Was there clarification whether he meant criminal aliens versus 18 U.S.C. offenders? That was not clarified, but the immigration is all civil, and so. Yes and no. I mean, the way particular agency people may view it, it's not clear. Yeah. It's very ambiguous. And remember, the whole thing started with the call from Nussbaum saying there's a gentleman at the Linn County Treasurer's Office trying to get a license plate or title with a social security number that using that does not belong to him. So to me, that's where the criminal investigation started. Thank you, Your Honor. Yeah.